**Opinion issued February 3, 2026**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-24-00167-CR

_____

**RICKY SHARROD BROWN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 337th District Court**
**Harris County, Texas**
**Trial Court Case No. 1684666**

---

## MEMORANDUM OPINION

A jury convicted Ricky Sharrod Brown of murder.[1]  Brown pleaded true to two punishment enhancements and the trial court assessed punishment at confinement for life.  Brown now argues on appeal that the trial judge was biased,

---

[1]  *See* TEX. PENAL CODE § 19.02.

the jury charge was incorrect, his motion to suppress was erroneously overruled, and his trial counsel was ineffective. We affirm.

## Background

Jose D. Cruz was "dumpster diving" for scrap metal at an apartment complex in Houston, Texas when he discovered a dead body wrapped in a carpet. The police determined that the dead person was Derick Randle and that he was a resident at an adjacent apartment complex.

Sergeant M. Brady of the Houston Police Department and his partner went to the apartment complex the next day and spoke with the manager, Tina Fuentes. Fuentes confirmed that Randle was a tenant and that he shared an apartment with Brown. They also learned that Brown drove a white Chevrolet pickup truck.

Sergeant Brady determined that the night before, a 9-1-1 caller had reported a disturbance and shots fired near Randle's apartment. The police responded without incident. Brady sought to determine whether the 9-1-1 call was connected to the murder, so he spoke with the 9-1-1 caller, Nicholas Jones. Jones told officers that he and his wife had been walking through the complex when they heard an argument and "noises like a car, like people in between the cars and their bodies hitting the car." He then heard two gunshots near a white truck in the parking lot.

2

Jones and his wife ran away from the direction of the gunshots and returned to their apartment—where he called 9-1-1 and reported the shots. Jones then stood on a generator outside the apartment while he waited for the police. While doing so, he looked in the direction of the shots and saw a white truck with the driver door opened. He also saw a man standing next to the open truck door who then walked across the driveway and into an alley. Jones recognized the man as someone he saw frequently around the apartment complex. He later identified Brown in a police line-up as the man he saw.

The police also spoke with Raynette Watts, a cashier at a nearby convenience store. She indicated that on the morning of the murder Brown and Randle came in the store together. While they were waiting in line, Brown yelled at Randle, "stop f***ing with me, I will—I will kill you, you know I will kill you." Later that night Watts, who lived in the same apartment complex as Randle, heard gunshots in the complex. About 15 minutes later she saw Brown walking back and forth between his white truck and Randle's apartment. Watts also said that two days after the murder, she saw Brown at the grocery store and he told her, "they can't f*** with me, they can't hold me." Watts understood Brown to be referring to the police's inability to charge him with a crime.

Police also spoke with Watts's husband, Thadeus Haywood. He told the police that about a week and a half before the murder, he was talking with Brown,

3

who told him that he "was going to put something on [Randle's] ass." Haywood understood that to be a threat of "[v]iolence, [or to] hurt him some kind of way." Haywood also heard gunshots on the night of the murder, but he did not see anything.

A few days later, the police obtained a search warrant for Randle's apartment. They did not take a crime scene unit with them because it was the height of the Covid crisis, and they were short-staffed. They also believed that the crime scene was in the parking lot, not the apartment. At that time, they did not collect any evidence of value.

Shortly thereafter, the police received an anonymous tip that they needed to speak to Paul Hopkins about the murder. After speaking with Hopkins, the police determined it was necessary to go back to the apartment to look for further evidence. The previous warrant had expired, but the detectives did not obtain a new warrant because they believed the apartment was abandoned. Also the apartment manager and Randle's family had given them permission to re-enter it. And they knew that the family intended to clean out the apartment the next day. On re-searching the apartment—with a CSU team this time—the officers recovered blood evidence and an empty bottle of bleach. They also searched the parking lot again and found a .380 caliber shell casing.

4

Police then spoke with Rochelle Lockridge, another resident at the apartment complex. She told the police that on the night of the murder, Hopkins was at her apartment. Brown had knocked on the door "about 10:00 or 11:00, 11:00" and was agitated and upset with Hopkins. The two men left the apartment together. Hopkins returned to her apartment at approximately 6:00 a.m. the next morning. He tried to tell Lockridge about what he and Brown had done, but she told him she "didn't want to hear about what's going on."

Having developed Brown as a suspect, officers brought him in for questioning—which was done by Sergeant M. Casso. During the interview, Brown initially denied shooting Randle or even being present at the scene. He told Casso that he did not live with Randle and they were not in a relationship. Brown said that, while he had stayed with Randle for a while, he had not been at the apartment in about a year and a half. Brown also denied being at the apartment on the day of the murder. He further denied driving a white truck—but when shown a cell phone photograph of himself standing next to a white truck, he "said it looked like him" and did not refute owning the truck after that. When shown a photograph of Hopkins and Lockridge, he denied knowing either of them. But he later stated that they must have disposed of the body.

When Casso asked Brown again whether he had been at the apartment on the day of the murder. Brown changed his story and said that he was there but did not

go in the apartment. Confronted with evidence that he had been identified in a police line-up, Brown claimed that "everyone was lying on him."

When Sergeant Casso told Brown that they had his phone and DNA evidence, Brown changed his story. Brown admitted to an altercation with Randle and claimed that Randle tried to hit him with a hammer. He said that he noticed the hammer when the gun went off. Brown also tried to show Casso where Randle hit him with the hammer, but Casso did not see any marks or injuries.

Brown eventually told Casso that a fight took place in the cab of his truck. He also said that he got rid of the hammer, but Casso did not believe that there ever was a hammer. When asked what kind of gun he used, Brown said it was a .380 caliber automatic, the same as the casing recovered from the parking lot. Brown said that he also got rid of the gun, but he would not tell Casso where it was. After initially claiming that he shot Randle once, Brown admitted to shooting him twice.

Brown was convicted of murder and sentenced to life in prison. He now appeals.

### Trial Court Bias

Brown initially claims that he was deprived of due process because the trial judge was allegedly impartial. According to Brown, the judge, during a mid-trial motion to suppress, "took over the State's advocacy role and tried to lead the witness into different answers he clearly hoped would help the state to establish

6

exigent circumstances."  Brown admits that he made no objection at the time but argues that this was structural error and cannot be waived.

## A.  Background

There were two searches of Brown's apartment—one with a warrant and then a another one after that warrant had expired.  During the trial, and outside the presence of the jury, the trial court held a suppression hearing regarding the second search.

During its questioning of Sergeant Brady, the State elicited testimony that, when conducting the second search, police (1) considered the apartment abandoned; (2) had permission from Randle's family and the apartment manager; and (3) entered the apartment with a key provided by the manager.  On cross-examination, defense counsel elicited information that Randle's family "wanted to start moving out on the 19th [the day after the second search]."  Once defense counsel passed the witness and the State indicated that it had no further questions, the trial court proffered the following questions to Sergeant Brady:

> COURT:  Why did you feel the need that you had to go back in the second time?
>
> WITNESS:  Can I answer that?
>
> COURT:  It was a question.
>
> DEFENSE COUNSEL:  Judge, technically—

7

COURT: Well, I'm just curious. You had a valid search warrant and you executed that search warrant and obviously you recovered evidentiary items that you felt would be important, and then after the . . . beyond the three days, you felt the need to go back into the apartment. And my question is, did you get some further information in your investigation that might make you want to do that?

WITNESS: Yes, sir, we did, on the 17th [the day before the second search]. We spoke to a witness that was involved with disposing of the body and told us that there was—the body had been taken into the apartment and there was bleach that was used to clean up some of the scene. And we didn't know anything about this until the 17th, so then that's when we went back on the 18th.

COURT: So on the 16th you had some information as a part of your investigation that the family wanted to go into the apartment and remove the contents, right?

WITNESS: Correct.

COURT: Did that set off any alarms in your brain?

WITNESS: No.

COURT: But then on the 17th, as a result of your investigation, you found that there might be some other evidentiary items in there, correct?

WITNESS: That's correct.

COURT: And then you obtained the consent on the 18th [the day of the second search]. Would there have been any reason why you could not have gone back to a magistrate and obtained an additional search warrant?

WITNESS: We could have. We—we thought it was abandoned property, and so we didn't.

COURT: Was there some concern that if you didn't do that that whatever information that you had about evidence being in that

8

apartment might be removed by the family? Was that of some concern to you?

WITNESS: Yes, we wanted to get there before the family was cleaning it up, on the 19th.

COURT: And I believe, if I recall your testimony, that you had some difficulty in obtaining the search warrant the first time, the first search warrant because the judge was—

WITNESS: Correct.

COURT: —delayed—I don't want to get too—delayed in—you went to him and said come back the next day and then it was the end of the next day before you got a search warrant.

WITNESS: Correct. We wrote it on the 11th [two days after the murder] and he finally signed it on the morning of the 13th.

COURT: Was that thought in your mind that that could very well happen again and that possibly you'd lose the opportunity to obtain some evidence because the family removed it, was that of some concern?

WITNESS: Yes.

COURT: Is that one reason why you didn't go back and get a search warrant?

WITNESS: Yes, we—yes.

COURT: So I guess what you're saying is—I don't want to put words in your mouth, I'll just ask you—are you saying that because of the additional information that you obtained in your investigation about property being in that apartment and your knowledge that the family was wanting to get in there to remove the contents of the apartment and the difficulty that you had in obtaining a warrant the first time and your feeling that the apartment had been abandoned, that the apartment project manager had control of the property, that's the reason you didn't get a search warrant; is that correct or incorrect?

9

WITNESS:  That is correct.

Brown argues that this was structural error because the trial judge "appeared intent on eliciting, contrary to what Brady had previously testified, that Brady felt he and his team felt an inescapable urgency to search the apartment without a warrant because the family would be removing items a couple days later," and that "[t]his line of questioning was designed to assist the State in its attempt to establish that there were exigent circumstances and consent justifying Brady's warrantless search."

### B.    Applicable Law and Standard of Review

"Due process guarantees 'an absence of actual bias' on the part of a judge." *Williams v. Pennsylvania*, 579 U.S. 1 (2016) (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623 (1955)), *Ex parte Halprin*, 708 S.W.3d 1, 4–5 (Tex. Crim. App. 2024).  When a judge is not impartial, the error is structural and immune to harmless-error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 309–10 (1991) ("The entire conduct of the trial from beginning to end is obviously affected . . . by the presence on the bench of a judge who is not impartial.") (citing *Tumey v. Ohio*, 273 U.S. 510 (1927)); *Halprin*, 708 S.W.3d at 4.

Thus, when a judge's actual subjective bias against a defendant is established, the defendant is entitled to a new trial without a showing of harm. *Fulminante*, 499 U.S. at 309–10; *Halprin*, 708 S.W.3d at 4.  And we conduct an

10

independent review of the record to determine claims of actual judicial bias. *Halprin*, 708 S.W.3d at 3.

A reviewing court presumes that the trial court was neutral and detached—absent a clear showing to the contrary. *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006). A trial judge is permitted to question a witness when seeking information, clarifying a point, or to obtain a clearer idea of the merits of the case. *Moreno v. State*, 900 S.W.2d 357, 359 (Tex. App.—Texarkana 1995, no pet.); *Burks v. State*, 693 S.W.2d 747, 750 (Tex. App.—Houston [14th Dist.] 1985, pet. ref'd);

In a bench trial, a judge may go beyond asking for mere clarification and ask questions that an advocate might ask in order to assist the fact-finding process. *Moreno*, 900 S.W.2d at 359. It is also permissible for a trial judge to question a witness "for the purpose of clarifying an issue before the court" if, during such questioning, the trial judge "maintain[s] an impartial attitude." *Brewer v. State*, 572 S.W.2d 719, 721 (Tex. Crim. App. 1978). But a judge must avoid becoming "so entangled as an advocate that he could not at the end of the proceeding make an objective finding of fact in the case." *Moreno*, 900 S.W.2d at 360.

## C. Preservation of Error

The State maintains that Brown failed to preserve error on this issue because he failed to object to the trial court's questions during the suppression hearing.

According to Brown, "a trial court's acts and behavior constituting fundamental constitutional due process error may be reviewed in the absence of a proper objection[.]"

In *Avilez v. State*, 333 S.W.3d 661 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd), we explained that certain legal rights cannot be forfeited and may be raised for the first time on appeal, because they "are widely considered so fundamental to the proper functioning of our adjudicatory process as to enjoy special protection in the system." *Id.* at 671. We also noted that a prior decision from our court had "reviewed for fundamental error an unpreserved complaint that the trial court was not impartial." *Id.* at 672 (citing *Jaenicke v. State*, 109 S.W.3d 793, 796 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). Accordingly, we assumed without deciding in *Avilez* that the appellant's complaints implicated that kind of systemic error that could be addressed in the first instance on appeal. *Id.*; *see also Riggins v. State*, 714 S.W.3d 74, 91 (Tex. App.—Houston [1st Dist.] 2023, pet. ref'd) (assuming, but not deciding, error preserved when addressing issue of judicial bias raised for first time on appeal).

We do so again here.

**D. Discussion**

In this case, the trial judge's questions were made outside the presence of the jury, thus there was no danger that his questions conveyed his opinion of the case

12

to the jury and influenced its decision. *See Moreno*, 900 S.W.2d at 359. Moreover, the judge's questions clarified the reasons for the warrantless search and requested further information on issues that had already been presented by the parties' witnesses, *i.e.*, the family's plan to clean out the apartment, the delay involved in getting the first warrant, and the family's and apartment manager's consent to the second, warrantless entry.

As in *Moreno*, the trial court "appear[ed] to be seeking facts for his fact-finding role, and the questions were within the bounds of what would have been allowed by the attorneys in the case." *Id.* And we note that not all the trial judge's questions at the suppression hearing were prosecutorial. Some of his questions were defense oriented, such as when he elicited testimony that Brown and Randle were a couple and that Brown regularly stayed at Randle's house.

Our independent review of the record thus shows that the trial judge here asked clarifying questions at the suppression hearing that were relevant to his fact-finding and that he maintained an impartial attitude in doing so. *See Brewer*, 572 S.W.2d at 721. As such, no structural error is shown.

We overrule Brown's first issue.

### Jury-Charge Error

In the jury charge, the paragraphs instructing the jury about Brown's claim of self-defense stated:

Therefore, if you find from the evidence beyond a reasonable doubt that the defendant, Ricky Sharrod Brown, did shoot Derick Randle with a firearm, as alleged, but you further find from the evidence, as viewed from the standpoint of the defendant at the time, that from the words or conduct, or both of Derick Randle it reasonably appeared to the defendant that his life or person was in danger and there was created m his mind a reasonable expectation or fear of death or serious bodily injury from the use of unlawful deadly force at the hands of Derick Randle, and that acting under such apprehension and reasonably believing that the use of deadly force on his part was immediately necessary to protect himself against Derick Randle's use or attempted use of unlawful deadly force, he shot Derick Randle, *then **you should acquit the defendant*** on the grounds of self-defense, or if you have a reasonable doubt as to whether or not the defendant was acting in self-defense on said occasion and under the circumstances, then ***you should give the defendant the benefit of that doubt*** and say by your verdict, not guilty[.] (emphasis added).

Brown contends that the trial court reversibly erred by instructing the jury that it "should acquit"—rather than "must acquit"—if it had a reasonable doubt about Brown's self-defense claim.

**A. Standard of Review**

Claims of jury-charge error are reviewed under the two-pronged test in *Almanza v. State*, 686 S.W.2d 157, 171–74 (Tex. Crim. App. 1985) (op. on reh'g). First, a reviewing court must determine if there is jury charge error. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). Second, if the reviewing court finds error, it then must analyze that error for harm. *Id.*

If a defendant does not timely object to error in the jury charge, the record must show "egregious harm." *Almanza*, 686 S.W.2d at 171. Error in a jury charge

14

is egregiously harmful if it affects the very basis of the case, deprives the accused of a valuable right, or vitally affects a defensive theory. *Id.* at 172. We must make that determination "in light of the entire jury charge, the state of the evidence, including the contested issues and weight of [the] probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.* at 171. Moreover, any determination of egregious harm must be based on "actual rather than theoretical harm." *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011).

Egregious harm is a difficult standard to meet, and the analysis is a fact-specific one. *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015); *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011). But neither party bears the burden to show harm or lack thereof under this standard. *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016). Rather, a reviewing court must independently examine the entire record to determine whether the appellant suffered actual egregious harm as a result of the error. *Id.*

**B. Discussion**

Here, Brown maintains that the word "should" is a permissive term that "undercut[] the presumption of innocence and undermine[d] the State's burden to disprove self-defense beyond a reasonable doubt." Brown relies on a single case from the State of Washington to argue that instructing the jury it "should acquit"

15

rather than "must acquit" is structural error. *See State v. Smith*, 298 P.3d 785, 790 (Wash. Ct. App. 2013) ("Erroneously instructing the jury that it may acquit if in reasonable doubt is structural error.").

This Court has considered and rejected this same argument in *Marshall v. State*, No. 01-23-00503-CR, 2025 WL 1759021 (Tex. App.—Houston [1st Dist.] June 26, 2025, pet. filed)[2] and *Thomas v. State*, No. 01-23-00892-CR, 2025 WL 2797603 (Tex. App.—Houston [1st Dist.] October 2, 2025, pet. ref'd) (mem. op.) (not designated for publication). In *Thomas*, we explained that "while it would have been preferable for the trial court to have used more uniform mandatory language throughout its charge, the trial court's self-defense instructions were not erroneous in the context of its jury charge as a whole." *Thomas*, 2025 WL 2797603 at *6; *see also Marshall*, 2025 WL 1759021, at *15 ("Although 'must' may be a preferable term, in the context of the jury charge as a whole, any rational jury would have concluded that isolated references to "should acquit"—paired with "will acquit" references—were mandatory commands not permissive suggestions.").

---

[2] After issuing our decision in *Marshall*, we granted the appellant's motion to reconsider publication of the opinion, making it a published opinion.

As in *Thomas* and *Marshall*,[3] we hold that use of the phrase "should acquit" in the jury charge was not erroneous in light of the charge as a whole.

We overrule Brown's second issue.

## Motion to Suppress

Next, Brown argues that the trial court reversibly erred in denying his motion to suppress evidence derived from the second warrantless search of Randle's apartment. We agree with the State that Brown failed to preserve this issue for appellate review.

### A. Background

After questioning Sergeant Brady about the initial search of Randle's apartment, the State questioned him about the follow-up search and the following exchange took place:

> PROSECUTOR: Did you later through your investigation come to learn that there was something of evidentiary value there?
>
> WITNESS: Yes.
>
> PROSECUTOR: And what was that?
>
> WITNESS: A bottle of bleach, an empty bottle of bleach.

---

[3] As in those cases, in several other places in the charge the jury was instructed "you will find the defendant guilty of murder," "you will find the defendant guilty of manslaughter," "you must resolve that [reasonable] doubt in the defendant's favor, "you will acquit," and "the State must prove beyond a reasonable doubt, that self-defense does not apply."

PROSECUTOR: And in that utility closet we saw where you had mentioned that the photographs were out of order. Was there something of evidentiary value there that you discovered on a subsequent search?

WITNESS: Yes.

PROSECUTOR: And what was it?

WITNESS: Blood, blood evidence.

PROSECUTOR: Where was the blood evidence?

WITNESS: It was in the back room along the door frame, some on the interior side of the door, and inside, inside the room on the floor.

PROSECUTOR: Describe how apparent the blood was?

WITNESS: Well, we didn't see it the first time we were there.

This testimony about the second, warrantless search—including the discovery of an empty bleach bottle and blood evidence—was admitted without a Fourth Amendment objection.[4] Once the State resumed questioning about the second search, defense counsel then objected as follows:

PROSECUTOR: And do you remember approximately when you spoke to Paul Hopkins?

WITNESS: On the 17th of June.

PROSECUTOR: Did you receive other information regarding Derick Randle's apartment?

---

[4] Defense counsel did object to the search on relevancy grounds and because Hopkins, the witness who led police to believe a second search was necessary, was deceased by the time of trial and unavailable to testify.

WITNESS:  Yes.

PROSECUTOR:  What information?

WITNESS:  The family was going to go to the apartment on the 19th and begin to clear it out.

PROSECUTOR:  So what did you do?

WITNESS:  So we went on the 18th.

PROSECUTOR:  And this time who did you take with you?

WITNESS:  We brought a CSU with us.

PROSECUTOR:  And were you there for the entirety of the CSU search?

WITNESS:  Yes.

PROSECUTOR:  May I approach the witness, Your Honor?

THE COURT:  Yes, sir.

PROSECUTOR:  Your Honor, may we approach?

THE COURT:  Sure. Do we need to send the jury out?

DEFENSE COUNSEL:  I think that would be a good idea, Judge.

THE BAILIFF:  All rise for the jury.
(Jury out.)

THE COURT:  Be seated.

DEFENSE COUNSEL: Judge, at this time I'm going to object to the search on the 18th.  The search warrant, which is in evidence, gave them three days to execute the search warrant.  They did that.  We've seen those photographs.  They're in evidence.  By the witness' own

19

testimony this next warrant is outside the three days. They did not have a search warrant anymore. All of this needs to be excluded as an illegal search.

## B. Discussion

To preserve error for appeal, the complaining party must make a timely, specific objection. TEX. R. APP. P. 33.1(a)(1); *Turner v. State*, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991). A motion to suppress made after the evidence or substantial testimony about the evidence has already been admitted without objection is untimely. *See Coleman v. State*, 113 S.W.3d 496, 500 (Tex. App.—Houston [1st Dist.] 2003), *aff'd*, 145 S.W.3d 649 (Tex. Crim. App. 2004); *Gonzalez*, 563 S.W.3d at 321.

Here, Brown did not make a motion to suppress evidence of the second search until after Sergeant Brady had already testified about re-entering Randle's apartment and discovering an empty bleach bottle and blood evidence. Because Brown did not object until after this testimony was already in evidence, his objection was untimely and nothing is presented for review.

We overrule Brown's third issue.

### Ineffective Assistance of Counsel

In issues four through six, Brown maintains that his trial counsel rendered ineffective assistance because he did not (1) preserve error on the motion to suppress, (2) preserve a confrontation-clause objection, or (3), object to or request

20

a redaction of Brown's invocation of his right to counsel and refusal to consent to a DNA swab. We address each contention in turn.

**A. Standard of Review**

The United States Constitution, Texas Constitution, and Texas Code of Criminal Procedure guarantee an accused the right to assistance of counsel. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. art. 1.051. As a matter of state and federal law, this includes the right to reasonably effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Ex parte Gonzales*, 945 S.W.2d 830, 835 (Tex. Crim. App. 1997).

To prevail on a claim of ineffective assistance of counsel, an appellant must prove by a preponderance of the evidence that (1) counsel's performance fell below an objective standard of reasonableness and that (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88, 694; *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). A failure to make a showing under *either* prong of the *Strickland* test defeats a claim for ineffective assistance. 466 U.S. at 697; *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

Under *Strickland*'s first prong, we must look to the totality of the representation to determine the effectiveness of counsel—indulging a strong presumption that counsel's performance fell within the wide range of reasonable

21

professional assistance and was motivated by sound trial strategy. 466 U.S. at 689; *Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006). Moreover, we "must be highly deferential to trial counsel and avoid the deleterious effects of hindsight." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). "The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel." *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012).

Allegations of ineffectiveness must be firmly founded in the record. *Thompson*, 9 S.W.3d at 813. In most cases, a direct appeal is an inadequate vehicle for raising an ineffective-assistance claim because the record is undeveloped, and a silent record cannot adequately reflect the motives behind trial counsel's actions. *See Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003); *see also Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).

When, as here, the record does not reveal the reasons for trial counsel's actions, we "will assume a strategic motivation if any can possibly be imagined." *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). Trial counsel should generally have an opportunity to explain his or her actions before we find the performance deficient. *Goodspeed*, 187 S.W.3d at 392. Without that opportunity, we should not find trial counsel's performance deficient "unless the challenged

conduct was 'so outrageous that no competent attorney would have engaged in it.'"
*Id.* (quoting *Garcia*, 57 S.W.3d at 440).

In rare cases in which counsel's ineffectiveness is apparent from the record, an appellate court may address the claim on direct appeal. *Lopez*, 343 S.W.3d at 143. But "the record must demonstrate that counsel's performance fell below an objective standard of reasonableness as a matter of law, and that no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of his or her subjective reasoning." *Id.*

Under *Strickland*'s second prong, we must determine whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. 466 U.S. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* That an error had "some conceivable effect on the outcome" will not suffice. *Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010). Rather, there must be a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt with respect to guilt. *Id.*

### B. Discussion

#### 1. Failing to Preserve Error—Motion to Suppress

Brown claims that his trial counsel was ineffective for failing to preserve error on his motion to suppress the evidence obtained during the second search of

23

Randle's apartment. This claim fails because (1) the evidence was admissible and (2) there was no reasonable probability that the result of the case would have been different without the admission of the evidence obtained during the second, warrantless search.

First, Brown denied living with Randle. He told police that Randle had allowed him to stay there in the past, but that Randle had "put him out," and that he had not been in the apartment in over a year. *See Jones v. State*, No. 01-03-00161-CR, 2004 WL 396443, at *2 (Tex. App.—Houston [1st Dist.] Mar. 4. 2004, no pet.) (memo. op., not designated for publication) (holding defendant lacked standing to object to warrantless search of apartment after telling police he did not live there). Because Brown had no standing to object to the second, warrantless search of Randle's apartment, the evidence obtained therefrom was properly admitted. Counsel is not ineffective for failing to object to admissible evidence. *See Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004) (holding counsel not ineffective for failing to object to admissible evidence). Thus, Brown cannot meet prong one of the *Strickland* test.

Second, even if defense counsel erred by failing to preserve error on Brown's motion to suppress, there is no reasonable probability that, but for the error, the result of the case would have been different. Brown argues that the evidence obtained in the second search—blood evidence and evidence that bleach

was used to clean the apartment—served to corroborate Sergeant Brady's testimony that a deceased witness, Hopkins, said that he and Brown brought Randle's body through the apartment, before disposing of it in a dumpster.

However, Brady's testimony regarding Hopkins's statement was hardly the only evidence corroborating Randle's murder by Brown. There was eyewitness testimony placing Brown outside the apartment just after shots and an argument were heard, Brown's statement to Randle made shortly before the murder that "I will kill you," and Brown's DNA on Randle's ankles, knees, jeans, and under his knees.

Most importantly, there was Brown's confession that he shot Randle, even though he claimed it was done in self-defense. In light of this overwhelming evidence of guilt, Brown cannot meet the second prong of *Strickland* by showing that, but for the alleged deficient performance, there is a reasonable probability that the verdict would have been different. *See Adekeye v. State*, 437 S.W.3d 62, 73 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (finding no prejudice for purposes of ineffective assistance based on stipulation informing jury of appellant's prior felony conviction when evidence of appellant's guilt for current offense was overwhelming).

We overrule Brown's fourth issue.

## 2. Failing to Preserve—Confrontation-Clause Objection

Brown next contends that his trial counsel rendered ineffective assistance by failing to preserve a confrontation-clause objection to testimony by Sergeant Casso—who told the jury that "[the police] received information that [Hopkins] assisted in disposing of the body of Derick Randle." Although no statements directly attributable to Hopkins were admitted at trial, Brown claims that the substance of Hopkins's statements was implied when officers testified that, based on information received about Hopkins's involvement, they searched the apartment again looking for bleach and blood. And he argues that his trial counsel should have objected to the admission of Hopkins's implied statements on confrontation-clause grounds because he was never able to cross-examine Hopkins.[5]

Even if we were to assume that Brown's trial counsel was deficient in not preserving a confrontation-clause objection,[6] we nonetheless conclude that Brown cannot meet the second prong of *Strickland* by showing that, but for the alleged

---

[5]     We note that there was significant discussion of the fact that Hopkins was unavailable to testify at trial because he had been murdered in an unrelated crime. The issue was resolved by allowing the State to tell the jury that Hopkins was deceased, and that Brown was not at all involved in his death.

[6]     Even though we do not address the first prong of *Strickland*, we note that defense counsel may have had a valid trial strategy for permitting testimony about Hopkins's involvement in disposing of the body. In his statement to police, Brown indicated that, while he shot Randle in self-defense, he believed that Hopkins and Rochelle Lockridge disposed of the body. Defense counsel might reasonably strategize that evidence about Hopkins's involvement corroborated Brown's statement that Hopkins and Lockridge disposed of the body.

deficient performance, there is a reasonable probability that the result of the case would have been different. *See Strickland*, 466 U.S. at 688.

In that regard, Brown claims that he was harmed by the absence of a confrontation-clause objection because Hopkins's implied statements "were the only source of the information that someone allegedly helped [Brown] dispose of the body, and were extremely prejudicial because they undercut [Brown's] claim of self-defense."

But we have already held that the trial court properly overruled the motion to suppress the evidence obtained during the second, warrantless search. And there was overwhelming evidence of Brown's guilt, including his unchallenged confession. Additionally, there was other evidence undercutting Brown's self-defense claim. Brown claimed that Randle attacked him with a hammer, but no hammer was ever recovered and police doubted that such a hammer even existed. Randle's neighbor, Jones, heard a scuffle, but he did not hear a hammer drop to the ground. And Hopkins's implied statements to police were not the only evidence of his involvement with the disposal of Randle's body. Lockridge testified that, shortly after the time of the murder, Brown came to her apartment in an agitated state and demanded that Hopkins, who was visiting, leave with him.

In light of the overwhelming evidence of both Brown's guilt and Hopkins's involvement in disposing of the body, Brown cannot show that, had a

27

confrontation-clause objection been made, there is a reasonable probability that the result of the case would have been different. *See Strickland*, 466 U.S. at 694.

We overrule Brown's fifth issue.

### 3. Failing to Request Redaction of Invocation of Fourth and Sixth Amendment Rights

Finally, Brown claims contends that his "defense counsel rendered ineffective assistance of counsel in failing to object to, and request a redaction of, [his] reference to and invocation of his right to an attorney, as well as his refusal to consent to a DNA swab."[7]  Brown does not claim that his confession was admitted in violation of his right to counsel or that his DNA was taken in violation of the general prohibition against warrantless searches.  Rather, he only argues that his trial counsel should have requested a redaction of the confession to omit his invocation of such rights.

Again, even if we assume that defense counsel was deficient for not objecting to and requesting the redaction of Brown's invocation of his constitutional rights,[8] we conclude that Brown cannot meet the second prong of

---

[7]  The right to an attorney is guaranteed by the Sixth Amendment of the United States Constitution, and the right to refuse a warrantless search is guaranteed by the Fourth Amendment of the United States Constitution.  *See* U.S. CONST. amends. IV and VI.

[8]  We note that at least two of our sister appellate court have found that defense counsel's failure to request such a redaction was not deficient representation. *See Cacy v. State*, 901 S.W.2d 691, 700 (Tex. App.—El Paso 1995, pet. ref'd (holding that counsel was not ineffective for failing to object to admission of defendant's

*Strickland* by showing a reasonable probability that, for counsel's deficiency, the result of the case would have been different.

Here, there was overwhelming evidence of Brown's guilt, including his unchallenged confession, eyewitness testimony placing him and his truck at the scene of the crime, evidence that he threatened to kill Randle, as well as Brown's DNA on Randle's body. It is unreasonable to believe that evidence that Brown refused a DNA test or asked for an attorney would have so influenced the jury that it would have returned a different verdict had it not heard such evidence.

We therefore hold that, even if trial counsel's performance fell below the standard of prevailing professional norms, Brown has not shown that but for counsel's deficiencies, the result of the proceeding would have been different. *See Strickland,* 466 U.S. at 688, 694.

---

invocation of right to counsel and objection to search); *Ex parte Owens*, 860 S.W.2d 727, 730 (Tex. App.—Austin 1993, pet. ref'd) ("[C]ase law certainly does not establish that any Texas attorney who fails to assert this rule [that refusal to consent to a search cannot be considered evidence of guilt] is operating below the prevailing professional norms.").

We overrule Brown's sixth issue.

## Conclusion

For all the reasons above, we affirm the trial court's judgment in all things.


Terry Adams
Chief Justice

Panel consists of Chief Justice Adams and Justices Gunn and Johnson.

Do not publish. TEX. R. APP. P. 47.2(b).